UNITED STATES DISTRICT COURT
for the
SOUTHERN DISTRICT OF FLORIDA

FILED BY _____ D.

98 SEP 23 PM 4:22

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA.-MIAMI

SECURITIES AND EXCHANGE COMMISSION,          )
                                             )
                              Plaintiff,     )
                                             )   CIVIL ACTION NO:
                                             )   98 - 7044
v.                                           )
                                             )   CIV - DIMITROULEAS
                                             )
DAVID MORGENSTERN,                           )   MAGISTRATE JUDGE
FRED MORGENSTERN,                            )   SELTZER
BERNADETTE STEVENS, AND                      )
AMQUEST INTERNATIONAL, LTD.,                 )
                                             )
                              Defendants.    )
                                             )

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission"), alleges that:

1.     This is an action for injunctive and other relief to prevent defendants David Morgenstern ("D. Morgenstern"), Fred Morgenstern ("F. Morgenstern"), Bernadette Stevens ("Stevens") and Amquest International, Ltd. ("Amquest" or the "Company")(collectively, "Defendants") from violating the federal securities laws by committing material misrepresentations or omissions, by employing schemes to defraud, or by engaging in deceitful and fraudulent acts or practices, in the direct solicitation of investors, in the preparation or distribution of offering materials, and in the use of proceeds, in connection with the offer, purchase and sale of securities.



2. The Defendants' activities resulted in approximately $4.1 million in losses to investors. Immediate injunctive relief is required to ensure that they do not fraudulently induce additional investors to entrust funds to them.

## THE DEFENDANTS

3. Defendant Amquest, a Nevada corporation, with its principal place of business in Ft. Lauderdale, Florida, describes itself in promotional material as a "financial services" business.

4. Defendant D. Morgenstern, age 48, has served as president and managing director of Defendant Amquest since February 1996. D. Morgenstern is also president and managing director of Kinsman, Merchant & Associates, Inc. ("KMA"), an alleged "consulting firm" affiliated with Amquest.

5. Defendant F. Morgenstern, age 48 and the twin brother of D. Morgenstern, performed virtually all bookkeeping functions for Amquest pursuant to a purported consulting agreement between Amquest and KMA. F. Morgenstern has held himself out as president, vice-president, "finance manager," secretary, treasurer, director, "compliance director" and "Chairman of the Executive Committee" of KMA. In corporate documents he has been described as "Finance Manager" and "Chairman" of the "Executive Committee" of SleepSource International, Ltd. ("SleepSource"), a company affiliated with Amquest. In numerous bank and brokerage account documents, F. Morgenstern is variously described as SleepSource's president, vice-president and secretary-treasurer.

2

6.     Defendant Stevens, age 39, is described in various corporate documents as corporate secretary of Amquest from April 1, 1996 to approximately April 1997; she is also described as having served as "Executive Director" of KMA from March 1996 through December 1996.  In numerous bank and brokerage account documents, Stevens is variously described as SleepSource's president, vice-president and secretary-treasurer.  During the relevant period, Stevens was a registered representative with a broker-dealer registered with the Commission.

### RELATED ENTITIES

7.     KMA, a Florida corporation, has, since its inception in 1995, shared offices with Amquest in Ft. Lauderdale, Florida.  KMA is described in an Amquest Form 10 registration statement filed with the Commission as a consulting firm, and is credited with having served as the "prominent operating management" of Amquest since February 1995. The Form 10 also attributes to KMA ownership of a controlling interest in Amquest, pursuant to KMA's purported "purchase" of Amquest on February 1, 1995 for $2,825,000.

8.     SleepSource, a Florida corporation controlled by D. Morgenstern, F. Morgenstern and Stevens, shared offices with Amquest in Fort Lauderdale, Florida.  SleepSource was supposedly formed as a holding company for a group of bedding product manufacturers and mattress retailers.

### JURISDICTION AND VENUE

9.     This Court has jurisdiction over this action pursuant to Sections 20(b) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b) and 77v(a), and pursuant to

Sections 21(d), 21(e) and 27 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d), 78u(e), and 78aa.

10.   The Commission brings this action pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Sections 21(d) and 21(e) of the Exchange Act, 15 U.S.C. §§ 78u(d) and 78u(e), to restrain and enjoin Amquest, D. Morgenstern, F. Morgenstern and Stevens from engaging in such acts and practices, and for other equitable relief against Amquest, D. Morgenstern, F. Morgenstern and Stevens.

11.   Certain of the acts and transactions constituting violations of the Securities Act and the Exchange Act occurred within the Southern District of Florida.  D. Morgenstern, F. Morgenstern and Stevens maintained and operated an office, operated Amquest and engaged in the acts and practices complained of herein within the Southern District of Florida.  Amquest's principal place of business was in the Southern District of Florida.  Upon information and belief, the Defendants reside in Broward and Palm Beach Counties, Florida.

12.   D. Morgenstern, F. Morgenstern and Stevens, directly or indirectly, have made use of the means and instrumentalities of interstate commerce and the means and instruments of transportation and communication in interstate commerce, and the mails, in connection with the acts, practices, and courses of business complained of herein.

## NATURE OF THE SECURITIES

13.   From April 1996 through December 1996, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens, directly and indirectly, induced investors to purchase the subject securities -- individual Series "A" "Units" consisting of 5,000 shares of Amquest

common stock and 5,000 Class "A" warrants, exercisable into Amquest common stock at $7.50 per share, with an exercise period of four years from the date of issuance.  Amquest investors purchased the Units in the hope that the Defendants, through their expertise and efforts, would cause the market value of their shares to increase, and for the opportunity, in the event of such appreciation, to exercise their warrants for shares of Amquest common stock.  The investors' funds were to be used by Amquest for its business operations, for marketing, and for purported expansion through the acquisition of other designated entities.

## OVERVIEW OF THE SCHEME

14.     In an alleged "private" offering of securities issued by Amquest over the course of 1996, the Company, through Defendants D. Morgenstern, F. Morgenstern and Stevens, misrepresented the ownership and value of its assets, the composition and involvement of its management, its business prospects, and the intended use of its stock offering proceeds.  D. Morgenstern, Amquest's president and managing director, masterminded the fraudulent scheme by drafting Amquest's fraudulent private placement memorandum ("PPM") and other promotional materials.  As a result of the Defendants' misconduct, Amquest investors were bilked out of approximately $3.4 million.

15.     A number of documents were used to promote the Amquest offering.  The primary document, the Amquest PPM, was prepared by D. Morgenstern.  Included in virtually every promotional package sent to prospective investors, in addition to the PPM, was a document entitled the "Arrowhead Financial High Growth Newsletter" (the "Newsletter").  In

5

packages sent to later investors, a version of the PPM was accompanied by both the Newsletter and a nine-page document entitled "Description of Amquest International, Ltd." ("Description").

16.     D. Morgenstern hired individuals, including Stevens, to promote and sell the Amquest offering. D. Morgenstern also hired F. Morgenstern to handle both the finances of Amquest and customer relations. In addition to enticing the Amquest salespersons with promised commissions, D. Morgenstern also provided them with the false information they used in their pitch to investors. As president of KMA and Amquest's secretary, Stevens compiled and forwarded that information in the offering packages to prospective Amquest investors. She also served as Amquest's marketing contact, both "cold-calling" potential investors and answering, by telephone and mail, the questions of individuals interested in investing in Amquest. On several occasions, described below, Stevens made oral representations to investors that she knew, or was reckless in not knowing, were false and likely to mislead the investors.

17.     During this same time period, D. Morgenstern, F. Morgenstern and Stevens controlled SleepSource, an entity intended to operate as a "manufacturer-driven retailer of mattresses and other sleep-related products," through their ownership of KMA, majority shareholder of SleepSource and "consulting firm" for both SleepSource and Amquest. In the fall of 1996, SleepSource, through the efforts of Defendants F. Morgenstern and Stevens, fraudulently raised approximately $700,000 from approximately 25 investors in an alleged "private" stock offering. As a result of the concerted misconduct of Defendants D. Morgenstern, F. Morgenstern and Stevens in connection with both the Amquest and SleepSource offerings, Amquest and SleepSource investors were bilked out of approximately $4.1 million.

6

18.    After the Amquest and SleepSource offerings, efforts to expand the fraudulent scheme occurred on two fronts. First, Defendants D. Morgenstern, F. Morgenstern and Stevens misapplied the Amquest and SleepSource offering proceeds, using the money to buy and sell Amquest stock in an apparent attempt to inflate artificially the price of the stock in the over-the-counter market. Second, D. Morgenstern prepared and filed with the Commission a fraudulent Form 10 registration statement. D. Morgenstern's motives in doing so were apparently twofold: to promote trading and increase thereby the price of Amquest stock, and to qualify the stock for listing on a major stock exchange.

## MATERIAL MISREPRESENTATIONS AND OMISSIONS IN THE AMQUEST AND SLEEPSOURCE OFFERING MATERIALS

19.    The Amquest PPM and accompanying offering materials, as well as the SleepSource PPM, contained numerous material misrepresentations and omissions. Morgenstern, who prepared the Amquest offering materials, was aware of the misrepresentations in the Amquest documents.  F. Morgenstern, who prepared the SleepSource document, was aware of the misrepresentations in that document.  Stevens, an officer of both Amquest and SleepSource, having used both the Amquest and SleepSource offering documents in furtherance of her sales efforts in the Amquest and SleepSource offerings, knew, or was reckless in not knowing of the material misrepresentations and omissions in those documents.  Defendants D. Morgenstern, F. Morgenstern and Stevens, all of whom knew or should have known of the material misrepresentations and omissions, took no steps to correct them.

A.    **The Fraudulent Amquest Materials**

          **1.**    **Misrepresentations re: the Financial Condition of the Company**

      20.    The full-page "Summary of Consolidated Financial Statements, May 31, 1996" contained in the Amquest PPM is replete with material misrepresentations.  Specifically, of the approximately $5.4 million in total assets claimed by the company, approximately $2.8 million claimed is without any basis in fact. The $2.8 million is comprised of approximately $1.8 million in fictitious "Investments in Securities" and approximately $1 million in fictitious "Prepaid Expenses."  In furtherance of the fraudulent scheme, D. Morgenstern, in later Amquest offering materials, ascribes to total assets an incredible $408 million, virtually all of which is fictitious.  D. Morgenstern, the author of the Amquest PPM -- including the financial statements -- knew, or was reckless in not knowing that these entries were false.  Defendant Stevens, who used the Amquest PPM in her Amquest offering sales efforts, also knew, or was reckless in not knowing that these entries were false.

          **2.**    **Misrepresentations re: the "Consulting Contract"
             with Montgomery, Smith and Associates, Inc.**

      21.    D. Morgenstern falsely stated in the Amquest PPM disseminated to prospective Amquest investors that a consulting agreement existed between Amquest and a New York consulting firm, Montgomery, Smith and Associates, Inc. ("MSA").   In the PPM, D. Morgenstern writes that, in connection with its securities offering, Amquest exchanged 80 Amquest Units with a $1 million value to MSA, as "pre-paid consulting fees."  According to D. Morgenstern, the fees "arise from a two-year contract" with MSA.  In addition, the Amquest

8

PPM falsely states that two principals of MSA acted as members of Amquest's "Advisory Council," serving the Council as "Banking Executive Advisors" to the Amquest Board of Directors and the Amquest "Executive Committee."   These misrepresentations were clear attempts by D. Morgenstern, their author, to enhance Amquest's credibility by highlighting the accomplishments of its purported consultants.  D. Morgenstern, the author of the Amquest PPM, knew, or was reckless in not knowing that these representations were false.  Defendant Stevens, who used the Amquest PPM in her Amquest offering sales efforts, also knew, or was reckless in not knowing that these representations were false.

### 3.   Misstatements re:  the $10 Million "Firm Commitment"

22.    The Amquest PPM contains a representation, under the heading "Additional Financing," that Amquest "has a firm commitment contract from a Germany-based investment group, ROCHEFORT ENTERPRISES, INC. ["Rochefort"], to raise a minimum of $10 million to a maximum of $25 million ... in a subsequent private placement program."   Purportedly, Rochefort, an investment firm with its own investors, would commit these moneys to Amquest for investment by Amquest and its affiliated entities.  The commitment was a sham.  There was no agreement between Amquest and Rochefort, and Rochefort conveyed no money to Amquest. D. Morgenstern, the author of the Amquest PPM, knew, or was reckless in not knowing that these representations were false.  Defendant Stevens, who used the Amquest PPM in her Amquest offering sales efforts, also knew, or was reckless in not knowing that these representations were false.

9

### 4.   Additional Fraudulent Statements regarding Amquest's Fundraising, Operations, Acquisitions and Assets

23.   The Newsletter sent to prospective investors was replete with additional misrepresentations.  For example, the Newsletter states that the Company 1) "completed its initial private placement for $2.5 million"; 2) "initiated a $125 million High Yield Reinvestment Program … under which $25 million is firmly committed"; 3) "completed its acquisition of First Mortgage Corp."; 4) "assembled an experienced management team with expertise in investment and mortgage banking"; 5) had a "commitment from brokers with $20 million under management"; and 6) that the Company "moved beyond letter [sic] of intent with a strategic prime bank partner to increase its mortgage warehousing lines from $15 million to $100 million."  None of these statements was true.  D. Morgenstern, the author of the Newsletter, knew, or was reckless in not knowing that these representations were false.  Defendant Stevens, who used the Newsletter in her Amquest offering sales efforts, also knew, or was reckless in not knowing that these representations were false.

24.   Stevens, who sent the Newsletter to prospective investors under cover of her own letter, and whose cover letter was used by other sellers of the Amquest offering, knew, or was reckless in not knowing, that the statements were false.  Adding to the deception, Stevens reiterates in her cover letter the false statements regarding Amquest's "acquisition" of First Mortgage Corp. and Amquest's "completion" of its stock offering.

25.   In the Amquest Description, D. Morgenstern, its author, refers to the following: $1,756,900 in gross revenue generated by Amquest as of July 31, 1996; a sale of Amquest

"Series A1A" Units grossing Amquest $245,075,000 in "cash and negotiable securities"; a sale of Amquest "Series A1B" Units grossing Amquest $160,267,483; a $50 million "pre-sale" by Amquest of "other Certificate issues"; and "total assets" attributed to Amquest of $408,315,309. All of these statements are completely false: Amquest never generated revenue; Amquest sold no "Series A1A" or "A1B" units; there was no "pre-sale"; finally, in contrast to the $408 million figure, Amquest actually had almost no assets.  D. Morgenstern, the author of the Description, knew, or was reckless in not knowing that these representations were false.  Defendant Stevens, who used the Description in her Amquest offering sales efforts, also knew, or was reckless in not knowing that these representations were false.

### 5. Misstatements re: the Use of Proceeds

26.     According to the Amquest PPM, the offering proceeds were to be used to fund "Investments in Assets," "registration" costs, marketing, and a "working capital reserve."  In actuality, of the $3.4 million raised in the Amquest offering, a substantial portion -- more than $2 million -- was used by Defendants D. Morgenstern, F. Morgenstern and Stevens to fund a scheme to attempt to inflate the price of Amquest stock -- through pre-arranged trades in nominee brokerage accounts.  Not surprisingly, there is no mention of this misuse of proceeds in the PPM.  The remaining $1.4 million in proceeds was used, at least in part, to pay salaries and sales commissions, and to acquire lavish office furnishings and "company" automobiles.

### B. The Fraudulent SleepSource Materials

27.     In a SleepSource PPM which, upon information and belief, D. Morgenstern and F. Morgenstern jointly prepared, it was represented to SleepSource investors that the bulk of the

offering proceeds would be used for SleepSource's acquisition of a mattress manufacturer and retail company, respectively, Custom Mattress Corp. ("CMC") and Sleep-O-Rama, Inc. ("SORI").   In fact, the proceeds were used to fund a fraudulent scheme, conducted by Defendants D. Morgenstern, F. Morgenstern and Stevens, to artificially inflate the price of Amquest stock through pre-arranged trades of Amquest stock.  Defendants D. Morgenstern and F. Morgenstern, having prepared the SleepSource PPM, knew, or were reckless in not knowing of the material misrepresentation.  Defendant Stevens, an officer of SleepSource, having used the SleepSource PPM in her SleepSource offering sales efforts, knew, or was reckless in not knowing of the material misrepresentation.

28.     The SleepSource PPM, dated June 15, 1996, stated further that SleepSource had already "consummated the purchase" of CMC, and that the former principals of both CMC and SORI had assumed top management positions at SleepSource, effective May 15, 1996.  These representations were false.   In fact, SleepSource never acquired CMC, and CMC and SORI principals did not assume top management positions at SleepSource.  Defendants D. Morgenstern and F. Morgenstern, having prepared the SleepSource PPM, knew, or were reckless in not knowing of the material misrepresentations.   Defendant Stevens, an officer of SleepSource, having used the SleepSource PPM in her SleepSource offering sales efforts, knew, or was reckless in not knowing of the material misrepresentations.

29.     Finally, the SleepSource PPM, in an included unaudited financial statement, falsely attributed to SleepSource certain "negotiable securities" valued, according to the financials, at approximately $1.9 million.  Defendants D. Morgenstern and F. Morgenstern,

having, upon information and belief, prepared the financial statement appended to the SleepSource PPM, knew, or were reckless in not knowing of the material misrepresentation. Defendant Stevens, an officer of SleepSource, having used the SleepSource PPM, including the financial statement, in her SleepSource offering sales efforts, knew, or was reckless in not knowing of the material misrepresentation.

## SUBSEQUENT ATTEMPTS TO EXPAND THE FRAUD

### A.    Unsuccessful Trading Scheme

30.    Defendants D. Morgenstern, F. Morgenstern and Stevens willfully diverted more than $2 million of the Amquest offering proceeds and virtually all of the $700,000 of SleepSource offering proceeds, to fund pre-arranged broker-facilitated trades of Amquest stock. The trades were conducted in the name of approximately 17 companies controlled, directly or indirectly, by the Defendants.  D. Morgenstern transferred the Amquest offering proceeds, using Amquest checks he personally signed, to KMA (Amquest's "management company");   F. Morgenstern, in turn, transferred the funds, using KMA checks he personally signed, to the numerous nominee accounts.  Likewise, F. Morgenstern transferred the SleepSource proceeds, with checks he signed, directly to the trading accounts.  Using these funds, D. Morgenstern, F. Morgenstern and Stevens were able to trade millions of Amquest shares in wash sales and matched orders, from March through August 1997, in an attempt to sustain an artificially high stock price.

13

31.     By attempting to inflate the price of Amquest stock through pre-arranged trades, D. Morgenstern, F. Morgenstern and Stevens had hoped to gain substantial profits upon the sale, direct or indirect, of their Amquest shares.  However, their scheme, conducted between March and August of 1997, ultimately failed: the price of Amquest stock, after holding steady between $5 and $6 from mid-December 1996 through late March 1997, plummeted in mid-April 1997, leveling off to its current sub-$1 level as early as April 25, 1997.

### B.     Other Fraudulent Activity by the Defendants

#### 1.     The Amquest Form 10

32.     On April 7, 1997, during the attempted manipulation of the price of Amquest stock by Defendants D. Morgenstern, F. Morgenstern and Stevens, Amquest filed with the Commission a Form 10, prepared by D. Morgenstern, containing numerous material misrepresentations. (Notwithstanding the withdrawal of the document prior to any declaration of effectiveness by the Commission, the document became accessible to the public once entered on EDGAR, the Commission's computerized document filing and retrieval system, available to the general public.)

33.     The material misrepresentations appearing in the Form 10 relate to (1) certain Brazilian "Rights" Amquest claims as assets and values at $256 million; (2) a "Letter of Payment" which Amquest records as a $25 million asset; (3) approximately $9.6 million in "unrealized income" the Company attributes to appreciation of the Rights; (4) $1.25 million in "deferred consulting fees" the Company claims as an asset; and (5) a $239,128 "note receivable"

which the Company claims is payable on June 30, 1997.   These representations are all completely false.   Defendant D. Morgenstern, who prepared the Form 10, knew or should have known that these representations were false.

34.     Attached to the financial statements in the Form 10 was an auditor opinion letter, forged by D. Morgenstern, certifying that the financial statements were "fair" and presented in accordance with GAAP.   Defendant D. Morgenstern willfully fabricated the opinion letter, and knew, or was reckless in not knowing, that the financial statements were not "fair," and were not presented in accordance with GAAP.

35.     The Amquest Form 10 contained material misrepresentations about Amquest's management as well.   Specifically, Amquest falsely claimed in the Form 10 prepared by D. Morgenstern that the two MSA principals and two other successful real estate entrepreneurs were officers and directors of the company.   D. Morgenstern knew, or was reckless in not knowing, that these repesentations were false.

### 2.   Amquest Press Release

36.     In a public press release dated May 21, 1997, Amquest announced the execution of "repurchase agreements" with "a specific group of shareholders that exchanged Brazilian judicial bonds [the Brazilian Rights] for the Company's restricted securities in 1996."   This press release, like virtually all other public information about Amquest, was completely false. Defendant D. Morgenstern, who upon information and belief prepared the press release, knew, or was reckless in not knowing, that this repesentation was false.

### 3. <u>Stevens' Oral Misrepresentations</u>

37.     In addition to the many written material misrepresentations described above, Defendant Stevens made oral misrepresentations to investors as well.  Amquest investors were instructed in the Amquest PPM to phone KMA, Amquest's "investment banking firm," in the event they had questions about Amquest or the offering.  In the course of fielding numerous calls, Stevens falsely informed an investor that Amquest had "holdings" in South America; to another investor she guaranteed that the price of Amquest stock would rise to $17-$20 per share; to yet another investor she falsely stated that Amquest had acquired First Mortgage Corp. and Flossmoor Properties and that in two years the investor's Amquest stock would be worth between $60 and $70 per share.  Defendant Stevens made these statements either knowing they were false, or with reckless disregard as to their truth.

### <u>THE DEFENDANTS PERSONALLY GAINED FROM THEIR MISCONDUCT</u>

38.     For her sales efforts in connection with the Amquest offering, Defendant Stevens received more money from Amquest in the form of commissions, approximately $164,000, than any other individual salesperson.  In addition, Defendants D. Morgenstern and F. Morgenstern received at least $135,000 and $365,000, respectively, of the Amquest and SleepSource offering proceeds.

## COUNT ONE
## FRAUD
## <u>VIOLATIONS OF SECTION 17(a)(1) OF THE SECURITIES ACT</u>

The Commission incorporates and realleges herein paragraphs 1 through 38 of this Complaint.

39.     Between April 1996 and continuing through at least August 1997, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, in the offer or sale of securities, as described herein, knowingly, willfully and/or recklessly employed devices, schemes or artifices to defraud, through acts which included, but are not limited to, the activities described in paragraphs 1 through 38, above.

40.     By reason of the foregoing, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act, 15 U.S.C. § 77q(a)(1).

## COUNT TWO
## FRAUD
## VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
## <u>AND RULE 10b-5</u>

The Commission incorporates and realleges herein paragraphs 1 through 38 of this Complaint.

41.     Between April 1996 and continuing through at least August 1997, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens, directly or indirectly, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any

17

national securities exchange, in connection with the purchase or sale of securities, as described herein, knowingly, willfully and/or recklessly:  (i)  employed devices, schemes or artifices to defraud; (ii) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices or courses of business which operated, or would have operated as a fraud or deceit upon any person in connection with the purchase or sale of such securities, through acts which included, but are not limited to, making the misrepresentations and omissions of material fact described in paragraphs 1 through 38, above.

42.   By reason of the foregoing, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 [17 C.F.R. 240.10b-5], thereunder.

## COUNT THREE
## FRAUD
## VIOLATIONS OF SECTIONS 17(a)(2) AND
## 17(a)(3) OF THE SECURITIES ACT

The Commission incorporates and realleges herein paragraphs 1 through 38 of this Complaint.

43.     Between April 1996 and continuing through at least August 1997, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens, directly or indirectly, by the use of the means or instruments of transportation or communication in interstate commerce, or by the use of the mails, in the offer or sale of securities, as described herein:

(a)     obtained money or property by means of untrue statements of material facts and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(b)     engaged in transactions, practices, or a course of business which operated as a fraud and deceit upon the purchasers of such securities, through acts which included, but are not limited to, the activities described in paragraphs 1 through 38 above.

44.     By reason of the foregoing, Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77(q)(a)(2) and 77(q)(a)(3).

WHEREFORE, the Commission respectfully requests that the Court:

## I.

### Declaratory Relief

(a)     Declare, determine and find that Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens committed the violations of the federal securities laws alleged herein; and

(b)     Declare, determine and find that Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens received ill-gotten gains through their violations of the federal securities laws, as described herein.

## II.

### Accounting and Disgorgement

Issue an Order requiring an accounting by Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens of all proceeds and benefits received by them, directly or indirectly, pursuant to the scheme described in this complaint, and awarding disgorgement in an amount to be determined by the court against Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens, jointly and severally, including prejudgment interest, to effect the remedial purposes of the federal securities laws.

### III.

### Civil Money Penalties

Issue an Order setting third-tier civil money penalties against Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78(d)(3), for violations of the federal securities laws as complained herein.

### IV.

### Permanent Injunction

Issue a Permanent Injunction, restraining and enjoining Defendants Amquest, D. Morgenstern, F. Morgenstern and Stevens, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them, and each of them, from violating Section 17(a) of the Securities Act, [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act, [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. 240.10b-5], thereunder.

### V.

### Further Relief

Grant such other and further relief as may be necessary and appropriate.  Further, the Commission respectfully requests that this Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that may hereby be entered, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

Respectfully submitted,


Glenn Harris
Florida Bar No. 357588

Jeffrey A. Cohen
Florida Bar No. 606601

DATE: September 23, 1998

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1401 Brickell Avenue, Suite 200
Miami, Florida  33131
Telephone: (305) 982-6341
Facsimile: (305) 536-7465

22

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

98 7044

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

CIV - DIMITROULEAS

### DEFENDANTS

DAVID MORGENSTERN,
FRED MORGENSTERN,
BERNADETTE STEVENS, and AMQUEST INTERNATIONAL,
LTD.

MAGISTRATE JUDGE
SELTZER

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____

(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Broward

(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

Ac Broward Co 98CV 7044 / WPD / Seltzer

**(c)** ATTORNEYS (FIRM NAME ADDRESS, AND TELEPHONE NUMBER)
Glenn Harris, Esq. (305) 982-6341
Jeffrey Cohen, Esq. (305) 982-6369 SEC, 1401
Brickell Ave., Suite 200, Miami, FL 33131

ATTORNEYS (IF KNOWN)
Laurie Bolch, Esq. (561) 338-7725
555 South Federal Highway, Suite 400, Boca Raton,
FL 33432

**(d)** CIRCLE COUNTY WHERE ACTION AROSE: DADE, MONROE, (BROWARD), PALM BEACH, MARTIN, ST LUCIE, INDIAN RIVER, OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN X IN ONE BOX ONLY)

☒ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (PLACE AN X IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                                   AND ONE BOX FOR DEFENDANT)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT   (PLACE AN "X" IN ONE BOX ONLY)

| A CONTRACT | PERSONAL INJURY | PERSONAL INJURY | FORFEITURE/PENALTY | A BANKRUPTCY | A OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | B☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | B☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | B☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | | | ☐ 630 Liquor Laws | A PROPERTY RIGHTS | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers Liability | | ☐ 640 R R & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| B☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| B☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | B SOCIAL SECURITY | ☒ 850 Securities/Commodities/Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | A LABOR | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilization Act |
| A REAL PROPERTY | A CIVIL RIGHTS | PRISONER PETITIONS | | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | B☐ 510 Motions to Vacate Sentence | ☐ 730 Labor/Mgmt Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| B☐ 220 Foreclosure | ☐ 442 Employment | HABEAS CORPUS: | ☐ 740 Railway Labor Act | FEDERAL TAX SUITS | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | B☐ 530 General | ☐ 790 Other Labor Litigation | A☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | A☐ 535 Death Penalty | ☐ 791 Empl Ret Inc Security Act | B☐ 871 IRS — Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | B☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | B☐ 550 Civil Rights | | | A OR B |
| | | B☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION   (CITE THE U S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

15 U.S.C. § 77q(a)(1), 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b-5, 15 U.S.C. §§ 77(q)(a)(2)
and 77q(a)(3).  Violations of the antifraud provision of the federal securities laws.

LENGTH OF TRIAL
via 10 days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C P. 23

DEMAND $
Perm. Inj., Acct.,
Disg., Civil Money Penalties

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☐ YES  ☒ NO

## VIII. RELATED CASE(S)
IF ANY    (See instructions):

JUDGE _____   DOCKET NUMBER _____

DATE   9-23-98

SIGNATURE OF ATTORNEY OF RECORD
Glenn A. Harris

---

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____